This is 22-2942 Washington County Water Company v. City of Sparta. We'll begin Mr. Dooley with you. Good morning, your honors. Good morning. Counsel, may it please the court. I'd like to begin with a little bit of background and context about the statute at issue in this case. Unlike many of the statutes that this court is asked to interpret or types of cases that this court hears, Title VII USC 1926B has not been before this court for the last 30 years. All told, since the enactment of the Consolidated Farm and Rural Development Act of 1961, there are barely over 200 cases nationwide in both the district and circuit courts that have examined the statute. And because of that, each case is vitally important to promoting the goals of the statute, which fundamentally are to promote economies of scale and to allow rural parts of America to develop with services more likely found in municipal environments, in this case water service. Allowing the district court's decision to stand would erode the reasonable period of time standard that circuit courts uniformly have held to be applicable in establishing 1926B protection. Importantly, to establish this protection, which is akin to an exclusive right to serve a specific area, a district must be first an association within the meaning of the Act. It must be indebted to the United States government through USDA financing. It also must have a legal right to provide service, and it must be able to provide service within a reasonable period of time after the request for service is made. In this particular case, the district court applied a section of the Illinois Administrative Code, Section 604-105, to conclude that Washington County water does not have a legal right to provide water service to Colterville. Now importantly, Washington County water has roughly 5,000 customers in over five counties and surrounds the village of Colterville. It does not produce water, meaning it does not have its own water treatment plant. Mr. Dooley, before you go too much further, I just want to confirm, because we haven't addressed it, as you've said, it's been a while since the Seventh Circuit has addressed this particular statute, but other circuits that have addressed the question of whether or not the Water District has provided or made available have applied this two-prong test. First one legal right, second one physical ability. Do you agree that's the test we should apply? I do agree that that's the test, Your Honor. Okay. I think the timing of some of the elements of the test are at issue in this case, and I'll get to that momentarily, particularly with respect to the ability to provide in a reasonable period of time. I think the legal right, I'll start with the legal right first though, because we do agree that a district must have a legal right, but it's the examination of what constitutes the legal right itself that we think the district court got wrong. If you look at a nonprofit water association, it is a unique creature compared to some of its counterparts, which often have certificated service boundaries. In a lot of states, a water district has to go to a court to be established or go to some public body to say this is, these are the four corners, if you will, of your district. In a nonprofit setting, courts often look at where do the pipes lie and use that to essentially form geographic boundaries. A good example of that is a Sixth Circuit's case, Ross County Water versus the City of Chillicothe. You're not saying that we shouldn't apply the Illinois statute that the court applied here. You're just arguing it should have been applied a different lease? So the court applied 604.105A in determining whether or not you had a legal right. Are you saying that was the wrong statute to apply or just that it was applied incorrectly? Because I understood your briefs to be arguing the latter. We are arguing the latter, but I also want to make mention that below we argue that the proper measure of legal right is not that administrative code section. Now on appeal, I did not understand that to be your argument. We're arguing that if it's going to be examined and we're accepting the fact the court examined it, we're arguing that the way the court looked at that statute or looked at that code section, and I want to be careful because this is an administrative code section and not a statute. Right, but for purposes of appeal, it seemed to me that you were not contesting that this was the appropriate vehicle to look at as to whether or not you had a legal right. You were just challenging the way that the court did it. I didn't see any argument, and please tell me if I missed it, but I didn't see an argument saying that there is a different way, a different statute, a different code provision that we should assess the legal right in the first place. That's correct. I think buried in the arguments though was the notion that it need not be looked at for purposes of legal right, but we embrace it for purposes of appeal to your Honor's point because that's how the district court looked at it. And importantly, an administrative code section is to be interpreted by an administrative body, in this case the Illinois EPA. And what's inherently wrong with a district court's opinion is the fact that it substituted its judgment, derived largely from the City of Sparta's expert, to prematurely conclude that if Washington County Water had made a request to the Illinois EPA for some additional permit, the Illinois EPA would deny it. Now there was no request for such a permit because again, Coulterville has strategically chosen to go with Sparta over Washington County Water. So the Illinois EPA has not weighed in, if you will, on whether the underlying administrative code section would be violated by what's proposed by Washington County Water. Is that something you could have gone to the Illinois EPA for? Or would it have to be Sparta? We would go to the Illinois EPA once Coulterville comes to us formally and says we'd like to get water. But before then, is that something you couldn't do? That's not. You wouldn't have standing to go and... That is correct. Now I want to talk about the language of the code section because I want to be clear that to the extent that the court is going to look at it as a basis to determine a legal right, we think the court misapplied the plain language of the actual code section. The code section says that the system must be designed to produce a certain amount of water, and that certain amount is based on the average or the maximum average daily demand plus 20%. And as I mentioned, Washington County Water does not produce its own water. It buys finished water from water producers. Kaskaskia Water District, Reed-Kincaid, and Nashville. That's where we get our water from and we furnish it throughout our system. When you take the word design and you apply it to a water district like Washington County, the way it should be looked at is, does the system as a whole, the pumping stations, the pipes, can it supply, if given the water from the sources, in this case those three entities I mentioned, can it move it around the system? Is it designed to furnish water at that capacity? And the answer is yes, as to Washington County Water Company. The district court, in doing the math, we think fundamentally erred when it deducted from our overall pumping capacity 300,000 gallons per day that had been historically allocated to serve Prairie State. What if that, you're correct on that point, how does that feed though into the full calculus? Is it possible there was an error on this but the district court could still be affirmed? No, your honor, because the pumping capacity of Washington County's water system is 1.992 million gallons per day. That's undisputed. Now Mr. Harmon, as far as expert, did a number of different calculations to see if he does that. If he takes that 300,000 and he subtracts it and says ultimately, after making a little few other adjustments here and there, he says you really only have 1.5 and some change. And that's just not true because at the time that he authored his opinion and at the time the district court made its decision, the contract had expired and we did not have that. There's a lot of ink spilled in the briefs on this Prairie State contract and I'm a little uncertain as to why given that it expired in 2021 on both the contractual capacity argument and the pumping capacity argument. It's important, your honor, because the district court viewed it as a limiting factor to our overall ability to serve Colterville and we had to emphasize the fact that that contract is not currently effective and therefore should have no application. I think you argued, used it in your favor on the contractual capacity argument and then said it shouldn't apply on the pumping capacity. I'm not sure why it applies at all given that it's expired. I understand your point, your honor. I don't want to give the impression we were trying to have it both ways. What we were saying with respect to the contractual capacity is there's water out there. If we need to get it, all we need to do is call Kaskaskia and say we'd like that extra 300,000 because we want to add it to our overall capacity. I see I only have 40 seconds left. I'd like to reserve that time for rebuttal unless there's any more questions. You may do so. Thank you. We'll now move to argument. Ms. Christine, how do you spell your, pronounce your last name? Scochilles. Thank you. Ms. Scochilles. Very good. Scochilles. Thank you. Argument on behalf of the Applelea. Thank you. Good morning, your honors, and good morning, counsel. May it please the court, my name is Christine Scochilles and I represent Applelea City of Sparta. And I want to cut straight to the bottom line, which Judge Brennan, I think you were getting at, that hones in on the fundamental problem in this case for WCWC. And the district court can be affirmed, despite any argument about pumping capacity and whether Mr. Harmon did the calculation right. And by the way, I'm happy to get into it, counsel mischaracterized how Mr. Harmon determined that pumping capacity was the limiting factor. But at the end of the day, if the court affirms the district court's construction of 604.105A, and it should, WCWC loses. According to WCWC's own calculations, and these are found on the bottom of Helen's brief, page 21, top of page 22, 120% of its customers' maximum daily demand is in the range of a maximum amount of water that WCWC can buy under its water purchase agreements is just over 1.7 million gallons per day. So by its own admission, WCWC does not have the capacity to satisfy the district court's interpretation of section 604.105A's minimum quantity. So to affirm for you, we would have to agree that you either, in making this determination about how much they were designed to produce, we either have to look at the contractual capacity or a combination of contractual capacity and pumping capacity. If we look solely at pumping capacity, which is what counsel is arguing, it seems like there's at least an issue of fact there. I think it depends on the situation. In this situation, a combination of pumping capacity and contractual capacity could be the limiting factors, or you could look at contractual capacity alone. But we couldn't look at pumping capacity alone and affirm. Given that we're at summary judgment, we take everything in the light most favorable to the non-moving party, and if we do that, they have a pumping capacity that exceeds the 20% number. I think that's fair. And I don't think that the court needs to get into pumping capacity. And so I'd like to turn now then to talk about why the district was designed to produce, to mean deliver to its customers, and designed, in design to produce, to refer to the factor or factors that limit a water association's ability to do that. And 604.105A is at base a water quantity regulation. It speaks in terms of maximum daily demand, which is a volume of a water association needs to be able to produce to its customers on a daily basis. And that's 20% greater than maximum daily demand. In the context of a water association that makes its own finished water, a factor that typically limits its ability to produce water to its customers is the amount of finished water that its water association can pump to its customers. It can't deliver more water than it can make. And that's where the majority of the case law lies. The circuit court cases, at least the ones I saw and the ones you identified, don't really address this situation where they're purchasing water from somebody else. Actually, one court did, and that was the Southern District of Indiana and the Santa La Hill. The circuit court cases, I said. Oh, I'm sorry. Yes, I think that's correct. I don't think any circuit court has dealt with this particular situation. But let's talk about this particular situation. So in the context of a water association that buys finished water from third parties for resale, the requirement is the same. The association must be able to produce to its customers at least 120% of maximum daily demand. One limiting factor in that case, as the district court correctly concluded, is the amount of finished water that the association can buy under its water purchase agreements. Because regardless of the amount of water that a association like WCWC can theoretically pump to its customers, it cannot deliver more water than it can buy. That's why WCWC's own expert focused on the maximum amount of water that WCWC could purchase under its water purchase agreements with its suppliers and not on pumping capacity. And that's why the district court also was correct to construe designed to produce to mean, at least in part, contractual capacity. Because that is one of the factors that limits WCWC's ability to produce water to its customers. And if WCWC can't meet that 120% minimum water requirement, which is imposed by IEPA under 604.105A under a set of regulations that are designed to make sure that everyone in Illinois has adequate and safe supply of drinking water, then it doesn't have the legal right under Illinois law to extend water service to Portugal. How is that consistent with the direction we've been given to liberally interpret the statute here to protect rural water associations that are indebted to the USDA? There's one thing to liberally construe that protection, and there's another thing of construing that protection to allow water associations that cannot legally provide water service under state law to have a monopoly on providing water service to a territory, which again, the state would not allow it to supply water to. Which is why courts routinely look at state law to define the association's protected service area or whether it has the legal right. So when you're looking at 1926B, which also has a goal of making sure that everyone, including people that live in rural and undeveloped areas, have a safe and adequate supply of drinking water, what's being curtailed if the state would not allow that water association to provide water service to a disputed area? And how could they make water service available if the regulating body in the state, PEER, IEPA, would not permit them to expand their water service territory to include that disputed area? And this is not one of those situations, as counsel mentioned, where there's a geographic boundary. That SPART is trying to tap into. There's no boundary geographically, but WCWC has to be bounded by the IEPA regulations that regulate public water supply systems. And because of this legal impediment, they're not entitled to section 1926B's protections, and this court should affirm the district court's judgment below. If you have any questions, happy to answer them. Thank you, Ms. Cochellos. Thank you. Mr. Dooley, we'll go back to you. We'll give you two minutes on rebuttal. Your Honors, I think what's important here is that Washington County Water Company does not have to make that service available to Colterville today. And that's the fundamental flaw in the district court's decision and in SPARTA's argument, is that they're looking at contractual capacity today. Every court, including this court 30-plus years ago. But what's the evidence that you could expand your contractual capacity? I think that's what the problem was. The court looked at the record, and the only evidence that was in there was a statement by the CEO of Washington County saying, oh, we could get more water. But nothing to support that. I understand that the district court was unpersuaded by his statement. But I think this court can also look at the Prairie State Agreement's existence and the fact that it just expired in 2021 and left 300,000 gallons out there for consumption if Washington County Water needs it. As evidence, particularly in a summary judgment context when Washington County Water is entitled to all inferences in its favor. I think what SPARTA is suggesting... But even if we use that 300,000 capacity, for the contractual capacity element, that doesn't get you over the 20%. It does, Your Honor. I don't think it does if you take out the 5.6% for leaks. That is a number that Mr. Harmon came up with. It is nowhere in the code. It is nowhere in the case law. And we take issue with its inclusion in his overall calculus. Again, what SPARTA and the district court are saying is Washington County Water needs to go out and prepay for water because the contracts themselves have minimums and maximums. And when you increase the max, you increase the min. So the philosophy behind SPARTA's argument is that if you're not going to produce water at a plant, then you need to go out there and buy more and commit to pay for more than you really need right now. That undermines this court's application of the reasonable period of time test, which gives Washington County Water at least the right to call up Kaskaskia and say, we need more water. Do you have it? If the answer is no, we lose. But we're entitled to it. What evidence do we have before us that indicates the capacity to buy more water from Prairie State? Because is there anything in the record to indicate that your client can get more water from Prairie State? Your Honor, to be clear, the water is not coming from Prairie State. It's coming from Kaskaskia. It originally, by contract, had been committed to Prairie State. That is the contract that expired. And I think if you look at Colterville's own water production, it's only producing 89,000, despite needing 77,000 gallons a day, which also, if you look at the strict language of the code section at issue, would violate that code. There's no Illinois EPA finding, and there's no Illinois EPA decision on how that applies to us in this setting. Thank you. We ask that the court reverse and remand. Thank you, Mr. Dooley. Thank you, Ms. Coachella. The case will be taken under advisement.